A/S ATLANTICA et al., M/V HOEGH TRAVELLER, Plaintiffs-Appellees,

v.

MORAN TOWING & TRANSPORTATION CO., INC., Tug Alice A. Moran, Inc., and TUG CLAIRE A. MORAN, in rem, Defendants-Appellants.

No. 803, Docket 73-2404.

United States Court of Appeals, Second Circuit.

Argued April 22, 1974.

Decided June 4, 1974.

MacDonald Deming, New York City (Haight, Gardner, Poor & Havens, New York City, on the brief, John J. Reilly, New York City, of counsel), for plaintiffs-appellees.

Kenneth H. Volk, New York City (Burlingham, Underwood & Lord, Eugene Underwood, New York City, on the brief), for defendant-appellant Moran.

Before LUMBARD and HAYS, Circuit Judges, and JAMESON, District Judge.*

JAMESON, District Judge:

This is an appeal from a judgment in favor of plaintiffs-appellees (Atlantica), owners of the vessel M/V Hoegh Traveller in an admiralty action to recover damages sustained by the Traveller while undocking at Pork Newark with the assistance of the Tug Claire A. Moran, owned by defendant-appellant (Moran).[1]

*Statement of Facts*

On the morning of February 2, 1966 the Traveller completed loading a cargo of scrap metal at Berth 27, Port Newark. At the request of Atlantica's local agent, Otto Fuerst, Moran was hired to furnish tug assistance in undocking and

---

* Senior District Judge of the District of Montana, sitting by designation.

1. The trial, before the court without a jury, was limited to the issue of liability. The opinion of the district court is reported at 360 F.Supp. 1225.

the tug Claire A. Moran was dispatched for this purpose.

At about 12:00 P.M. the tug Moran proceeded to the vicinity of the Traveller. The pilot, Captain Robert C. Nielson, observed and estimated the draft and length of the vessel.[2] On the basis of his observations he formulated "a basic plan" for undocking, that is, to "back her away from the dock, back around" in the Branch Channel and then head out into Newark Bay. Nielson testified that the plan was, however, "subject to change when I get aboard the bridge of the ship to find out what the conditions are, how long the ship is, how deep it is".

At 12:45 P.M. Nielson boarded the Traveller to serve as its undocking pilot. When he arrived on the bridge he met the vessel's master, Captain Sverre I. Yksnoy, who provided Nielson with the exact draft of the vessel, 28 feet, six and one-half inches forward and 29 feet, seven and three-quarters inches aft, and its length at water line, 547 feet. Nielson then explained that he intended to turn the ship in the Branch Channel, which is 600 feet in width and dredged to a depth of 35 feet at mean low water. On the day in question the height of the water was three feet above datum, giving a total depth of 38 feet.

Pursuant to Nielson's instructions the tug Moran was made fast to the port bow of the Traveller. Nielson ordered the tug to push on the port bow, and at the same time the Traveller's engines were put astern. The first attempt to move away from the berth was unsuccessful because the loaded Traveller was lying in a trough of accumulated bottom material. Nielson ordered the engines ahead and then backed again. The vessel came free and moved astern and away from her berth.

When the bow of the Traveller cleared the end of the wharf, Nielson ordered the rudder hard right and the engines

slow ahead. With the tug pushing at full power on the port bow the Traveller began pivoting in the Branch Channel. When the Traveller was half way around heading straight across the channel a loud bang was heard coming from the direction of the stern, where the steering engine room is located. The Traveller's smooth deck log states: "[W]e could feel a bump and the helm was torn out of the hands of the helmsman", who reported that he had lost control of the rudder.

Due to the loss of the Traveller's steering ability Nielson determined that another tug would be needed to maneuver the vessel. Upon arrival of the second tug the crippled vessel was returned to its berth. Nielson accompanied Captain Yksnoy to the steering engine room, where they observed "lots of broken parts" of the steering mechanism, including two three-inch steel rams that had been snapped off. The following day Atlantica employed a diver to inspect the Traveller's rudder. He "found some heavy clay on the after end of the rudder about two feet high from the bottom". As to the cause of the damage to the steering mechanism, Nielson testified that it was "one of three things. Either that we hit a submerged object or we run up against the bank or there was a latent defect in the steering ram".

With respect to the propriety of attempting to turn the 547 foot Traveller in the 600 foot Branch Channel, Nielson testified that on a number of occasions he had turned larger vessels in the Branch Channel, using only one tug, without mishap. On the other hand, Atlantica's expert, Captain Arthur Fertig, a licensed master and maritime consultant, testified that due to the length of the Traveller and the width of the Branch Channel it was "most imprudent" to attempt the turn, and that the Traveller should have been backed into the wider Main Channel and the turn made there.

2. Nielson testified that his estimate of the vessel's draft "could have been off maybe three or four feet on the stern" and that the estimate of length "could have been off maybe 50, 60 feet".

Fertig and Nielson agreed that two tugs would be required to turn the vessel in the Main Channel to overcome the effect of the Main Channel current. In Fertig's opinion the tugs should have "12 to 15 hundred horsepower in each tug", whereas the Moran tug had only 700 horsepower. Fertig testified further, that the tight Branch Channel turn should not have been attempted with less than two tugs, because the vessel had to be controlled "to a point of exactness". Even with two tugs, however, he considered the Branch Channel turn "imprudent" and "not good seamanship". Captain Yksnoy testified that Nielson had represented the Branch Channel to be 660 feet in width, that if he had known it was only 600 feet he would have objected to turning the vessel with only one tug, and that in any event he considered it "risky to turn the ship [in the Branch Channel], even with two tugs".

### Opinion of the District Court

The district court found that Moran was "negligent in failing to provide two tugs of adequate power to assist the Hoegh Traveller undock and in formulating and attempting to carry out an imprudent plan by which the Hoegh Traveller was to undock and proceed to sea". The court concluded that it was not possible to turn the ship in the Branch Channel "with any reasonable assurance of safety", although there was "substantial evidence that it would have been reasonable for the pilot to have taken the vessel backwards to the main channel and turn her around at that juncture". Noting that "there was some conflict as to whether the Hoegh Traveller actually struck the bank", the court found that "the weight of evidence is that the rear end of the ship likely hit the bank", and that this was a result of Moran's negligence.

Moran contended in the district court, as it does here, that the pilotage clause in the written towage contract relieved Moran of liability, even assuming it was negligent. This clause provides:

"When any licensed pilot or a captain of any tug furnished to or engaged in the service of assisting a vessel making use of or having available her own propelling power, goes on board such vessel, it is understood and agreed that he becomes the borrowed servant of the vessel assisted and her owner or operator for all purposes and in every respect, his services while so on board being the work of the vessel assisted and not of the tugboat company and being subject to the exclusive provision and control of the ship's personnel."

Noting that "such clauses have been narrowly construed against towing companies" the court held that it "cannot be used as a defense where as here a negligent plan is put into operation and the pilot boards and navigates the vessel pursuant to the preconceived plan".

### Contentions on Appeal

Appellant Moran contends that (1) there is no evidence to support the district court's conclusion that the Traveller "likely hit the bank"; (2) appellees failed to prove negligence; and (3) in any event appellant cannot be held liable under the pilotage clause. Since we conclude the pilotage clause precludes recovery, it will not be necessary to consider the other contentions.

### Pilotage Clause

The standard pilotage clause involved here is nothing more than a contractual application "of the well-established rule that when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former." Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 295, 53 S.Ct. 135, 136, 77 L.Ed. 311 (1932).[3]

3. In holding that a towage company was not liable for the negligence of tug captains who became the servants of the vessel's owners, the Court noted that the owner of the vessel "was under no compulsion to accept the terms of [tower's] pilotage clause" and con-

Appellees do not challenge the validity of the pilotage clause but argue that it is not applicable under the facts of this case. Specifically it is contended that the pilotage clause affords no protection for any negligence of the dispatcher in failing to provide two tugs of adequate power or for acts of the pilot before boarding in formulating a negligent undocking plan.

■■ It was Captain Fertig's opinion that the undocking of the Traveller should not have been attempted with less than two tugs of 1,200 to 1,500 horsepower each. Daniel J. Nelson, Jr., a dispatcher for Moran for 16 years, testified that the initial decision as to the number and size of the tugs rests with the dispatcher, and that in his opinion two tugs should have been dispatched to assist the Traveller in undocking. On the other hand, Nelson also testified that the dispatcher's duty is "only assigning the equipment to assist" the pilot, and that if the pilot, as "the man in control at the scene", orders additional tugs, his judgment controls and the dispatcher will provide the tugs requested.[4] The

final responsibility for adequate tug power rested upon the pilot, and any negligence in this regard must be attributed to Nielson rather than the dispatcher.[5]

The district court recognized that it was the pilot's responsibility to provide adequate tug power but concluded "that pilot Nielson's preconceived plan of turning the vessel in the Branch Channel and in not supplying tugs of adequate power was negligent and in breach of Moran's warranty of workmanlike service" and "that the pilotage clause in Moran's towing contract is not applicable as a defense."

While there is authority to support the conclusion that failure of a pilot to request adequate tug power is a breach of the warranty of workmanlike service implied in the towage contract and outside the pilotage clause,[6] this is not the law in this circuit. The contention was rejected by this court in Transpacific Carriers Corp. v. Tug Ellen F. McAllister, *supra,* where the district court had held that "The negligent act of the pilot * * * was primarily his hav-

---

cluded that ."It would be unconscionable for [the owner of the vessel] upon occurrence of a mishap to repudiate the agreement upon which it obtained the service." 287 U.S. at 294–295. See also Santa Fe, P. & P. Ry. Co. v. Grant Bros. Co., 228 U.S. 177, 188, 33 S.Ct. 474, 478, 57 L.Ed. 787 (1913) ; Transpacific Carriers Corp. v. Tug Ellen F. McAllister, 336 F.2d 371 (2 Cir. 1964), where this court suggested that "[h]ad the ship owner wished protection against the type of damage here suffered it might well have secured it at an appropriate rate", but "[h]aving accepted towing services under an agreement providing for certain limitations of liability, libelant is not entitled to have this court rewrite the contract and impose liabilities not bargained for." *Id.* at 375–376.

4. In addition, Nielson testified that it was his "prerogative" to request additional tugs "if at any time during a docking or undocking maneuver" he felt that "more power or different power" is necessary.

5. See Farrell Lines, Incorporated v. Birkenstein, 207 F.Supp. 500, 508 (S.D.N.Y.1962). Judge Friendly noted that "One possible basis of liability would be that Moran's des-

patcher should have instructed Cray [the pilot] not to undertake the navigation of Gowanus Bay under the conditions prevailing without having the [tug] James Moran actually at hand or at least being certain that she or some other tug, in addition to the Pauline, would be available by the time the Birkenstein reached 35th Street, where the Bay narrows and radar difficulties might be anticipated." This basis of liability was rejected upon the grounds that "the Towing Contract does not indicate by its terms that Moran undertook so heavy an obligation and the record is barren of evidence of any custom or practice that the despatcher, or Moran's head office generally, assumed, or was required by express or implied warranty to assume responsibility for such detailed supervision of docking operations of which supposedly competent masters and tug captains were in charge."

6. See People of State of California v. The Jules Fribourg, 140 F.Supp. 333, 340 (N.D. Cal.1956) ; Publicker Industries v. Tugboat Neptune Co., 171 F.2d 48, 49 (3 Cir. 1948) ; and American South African Line, Inc. v. Sheridan & Company, Inc., 1936 A.M.C. 287 (E.D.Pa.1935).

ing insufficient tug power available to assist in the docking", and that "the pilotage clause [does] not seem to embrace this act of negligence." 336 F.2d at 373–374. This court reversed, holding that the negligence which caused the accident was not the pilot's failure to order a second tug, but was in fact "in [the pilot's] handling the ship in the way he did with the one assisting tug". We held that the "docking pilot's acts were within the terms of the pilotage clause". The same principle is applicable here.

■ We turn now to Atlantica's contention that the accident resulted from Nielson's formulation of a negligent plan before boarding and that the implementation of the preconceived negligent plan is outside the pilotage clause. A similar contention was rejected in *Birkenstein, supra,* where the owner of the assisted vessel argued that the pilot should have decided before going on board that it was unsafe to proceed in the light of then existing conditions of fog and limited visibility. In answering this contention Judge Friendly said in part:

> "This places the duty of decision too early; there was no reason why Cray [the pilot] should have formulated a fixed view until he had all the facts. Moreover, his failure to formulate a view was without consequence; what mattered was what he did when he boarded the Birkenstein. If Cray then neglected to make sound recommendations, it was a failure, after he went on board, 'in respect of the handling of such vessel,' and thus within the pilotage clause." 207 F.Supp. at 506.

Judge Friendly suggested "it was better to postpone decision until Cray could talk things over with the master and others on board" and that "what mattered was what Cray did, not what he had decided or failed to decide to do". *Id.* at 509.

After quoting from the opinion in *Birkenstein* and noting that a "similar

fact situation was before the court", this court said in *Transpacific Carriers:*

> "From the moment the docking pilot took over the responsibility of docking the ship, he was giving orders and was handling it. He was aware of the power of his tug, the strength of the current, the time before slack water and the character of the area in which he had to maneuver. It was his decision to back out into the channel; his decision to bring the ship broadside along the end of the dock; and his decision in the light of all factors influencing the docking operation to do this in the belief that the Ellen F. McAllister was adequate for the purpose. He was clearly 'handling' the ship and 'giving' orders." 336 F.2d at 374.

It is true, as appellees argue, that Nielson had formulated a "basic plan" for the Branch Channel turn prior to boarding the Traveller. Presumably that would be true with respect to most docking and undocking operations. The final decision, however, was made and the plan implemented after Nielson was aboard and "handling" the vessel and "giving" orders.

While Nielson testified that upon the basis of his observations of the Traveller, he had "a fairly good idea" as to its length and draft and "knew what [he] needed to know for this maneuver before [he] went on board", he did not know the vessel's exact length and draft prior to boarding and his plan was "subject to change when I get aboard the bridge of the ship to find out what the conditions are, how long the ship is, how deep it is". On boarding he questioned the captain as to "the particulars of the ship, whether the ship was ready, what was the length and her draft". Upon receipt of this information he informed the captain that he had decided to turn the vessel in the Branch Channel. With several factors crucial to Nielson's plan to be determined on board, it is clear that his preconceived plan was far from complete when he boarded the vessel. If he acted negligently in making his final decision

and in the subsequent implementation of the plan, his negligence was within the scope of the pilotage clause.[7]

Atlantica's reliance upon Pennsylvania Railroad Co. v. The S. S. Beatrice, 161 F.Supp. 136 (S.D.N.Y.1958), aff'd, 275 F.2d 209 (2 Cir. 1960) and Petition of Marina Mercante Nicaraguense, S. A., 364 F.2d 118 (2 Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967) is misplaced. In *Beatrice* it was held that the pilotage clause "must, of course, be strictly construed against the towing company and should be given no broader interpretation than its language clearly requires", 161 F.Supp. at 149, but there was no suggestion that the implementation of a negligent plan was outside the clause. *Marina Mercante* states that the tug owner is responsible "for negligent acts of [the pilot] before boarding" the assisted vessel, 364 F.2d at 122 at n. 5, but negligent acts are to be distinguished from negligent plans which are not finalized or implemented until after the pilot is on board.

Reversed and remanded for entry of judgment in favor of defendants.

---

7. Appellees' argument and the decision of the district court that the implementation of a preconceived negligent plan is outside the pilotage clause finds support in American South African Line, Inc. v. Sheridan & Company, Inc., *supra*, but its holding is contrary to the rule in this circuit established by *Birkenstein* and *Transpacific Carriers*.