**STEVENS INSTITUTE OF TECH-NOLOGY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 69 Civ. 4329.**

United States District Court, S. D. New York.

April 30, 1975.

Supplemental Opinion May 27, 1975.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Sheldon A. Vogel, John H. Parker, New York City, of counsel.

Paul J. Curran, U. S. Atty., U. S. Dept. of. Justice, Admiralty & Shipping Section, New York City, for defendant; Gilbert S. Fleischer, New York City, Atty. in Charge, Gilbert S. Fleischer, Janis G. Schulmeisters, New York City, of counsel.

LASKER, District Judge.

Stevens Institute of Technology (Stevens) sues for damages to a vessel it purchased from the United States in 1967. The government admits that the damages resulted from the negligence of one of its officers. The issues are the effect of certain exculpatory clauses

contained in the contract of purchase and the amount of damages, if any, due Stevens.

The United States Maritime Administration had kept the SS Exochorda, a passenger vessel, "held up" since 1959 as a "navy retention ship." In 1967, Stevens submitted an Invitation to Bid (Exhibit E) to MARAD for the purchase of a passenger vessel which it hoped to use as a dormitory. The bid was conditioned on the promise that:

"The Buyer shall not at any time use or operate the ships, nor cause or permit same to be used or operated, as a means of transportation of passengers or cargo for hire, or as a means of transportation of proprietary cargo." (Condition I)

The bid contained further provisions that:

"IX. *Terms of Sale.* (A) *Warranties.* Each ship is offered for sale as is, where is, * * *, without warranty, guaranty, or representation as to seaworthiness, condition, description, tonnage, or otherwise. However, the bill of sale conveying title to the Buyer will fully warrant title and freedom from all liens.

(B) *Responsibility for Ships.* The Buyer of each ship shall assume all risks of ownership thereof from the time the Buyer receives notice of acceptance of its bid, and the Administration shall not thereafter be liable for any loss thereof or damage thereto either in whole or in part, nor will the Buyer be excused from performance or the purchase price be reduced by reason thereof.

\* \* \* \* \* \*

(D) *Delivery of Ships.* (1) The Administration will, without cost or expense to the Buyer, but at the risk of the Buyer, break each ship out from its present location and make the ship available fleetside for delivery to the Buyer within five (5) days after receipt of written request therefor from the Buyer, provided, however, that the Administration shall not be liable for delay in breaking any ship out due to conditions beyond its control or conditions which by the exercise of reasonable diligence it was unable to prevent."

MARAD accepted Stevens' bid and the Government arranged for the vessel to be "broken out" from the fleet by MARAD's tugboats and personnel, in accordance with Paragraph IX(D)(1) of the Invitation to Bid. Stevens hired two tugboats to tow the ship to its next destination and offered their assistance, on the date of the breaking out, to Captain Syre, the MARAD officer in charge. Syre refused the offer, used only MARAD tugs and, in the process of removing the ship from the fleet, misjudged the force of the tidal current, causing damage to the ship's bulwarks at various locations, port and starboard. (Exhibit H) (Pre-trial Order Paragraphs (3) (xii)–(xix)). Although the estimated cost of repairs totalled $36,070., Stevens actually repaired the damage only partially, to the tune of $5,296.

## A. Effect of Exculpatory Clauses

The government contends that Paragraphs IX(B) and (D) of the Invitation to Bid provide a complete shield against liability, even that occasioned by its own negligence. Stevens attacks this extreme stance, claiming that the clauses do not bar recovery because they do not explicitly exculpate negligent acts of the government; or that, if interpreted to cover the incident here, the provisions contravene public policy and are unenforceable.

■ ■ 1. It is settled that a contract and, in particular, exculpatory clauses, should be strictly construed against the drafter (here, the United States). As the Supreme Court has noted:

"A number of courts take the view, frequently in a context in which the indemnitee was solely or principally responsible for the damages, that there can be indemnification for the indemnitee's negligence only if this

intention is explicitly stated in the contract." United States v. Seckinger, 397 U.S. 203, 211 n. 15, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970) (citations omitted).

The exculpatory terms of the contract here are at first blush pretty all-encompassing:

"(B) The Buyer . . . shall assume all risks of ownership . . . and the Administration shall not . . . be liable for any loss . . . or damage . . .; and (D)(1) The Administration will, . . . at the risk of the Buyer, break each ship out."

Similarly expansive language, however, has been held by at least one court not to create an agreement to indemnify the United States against its own negligence. United States Steel v. Warner, 378 F.2d 995, 999 (10th Cir. 1967) ("safety of all persons . . . shall be the sole responsibility of the Contractor"); see Sterner Aero AB v. Page Airmotive, Inc., 499 F.2d 709 (10th Cir. 1974); Kansas City Power & L. Co. v. United Telephone Co. of Kansas, Inc., 458 F.2d 177, 179 (10th Cir. 1972); Becker Pretzel Bakeries, Inc. v. Universal Oven Company, 279 F.Supp. 893 (D.C.Md.1968). The view that escape from liability must be specified with particularity reflects a judicial reluctance to absolve a negligent party of responsibility and to impose it on faultless victims; and "is particularly applicable to a situation in which there is a vast disparity in bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors." United States v. Seckinger, *supra*, 397 U.S. at 211–212, 90 S.Ct. at 885; *accord*, Ozark Dam Constructors v. United States, 127 F.Supp. 187, 190–191, 130 Ct.Cl. 354 (1955).

The *Seckinger* rule, and the narrow construction given exculpatory clauses by lower courts fit the situation here. Accordingly, although the contract provision here referring to delivery of ships may literally saddle the Buyer with the risks of "breaking out," (Paragraph IX (D)(1)) it does not follow that the provision encompasses risks actually created by the government's own negligence, as distinct, for example, from risks created by natural calamity or without government fault.

2. In any event, the government cannot escape liability, for we believe that on the basis of the facts here, a contract which exculpates the United States from responsibility for its own negligence is unenforceable on public policy grounds.

Two distinct lines of cases exist in this area. One is based on Sun Oil v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932) which upheld the validity of "pilotage clauses" which exculpate tug owners from the negligence of a pilot furnished by the tug to another ship. The rule rests on the application of the master-servant rationale, that

"When one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former." Sun Oil v. Dalzell Towing, Id. at 294–295, 53 S. Ct. at 136.

*See*, A/S Atlantica v. Moran Towing & Transportation Co. Inc., 498 F.2d 158 (2d Cir. 1974); Petition of Marina Mercante Nicaraguense, S.A., 364 F.2d 118 (2d Cir. 1966). The second, based on Bisso v. Inland Waterways, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) and Dixilyn Corp. v. Crescent Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), holds that towage contracts which release towboats from all liability for negligent towage are invalid as a matter of public policy. The policy considerations specified in *Bisso* are:

(1) to discourage negligence by making wrongdoers pay damages, and

(2) to protect those in need of goods or services from being overreached by others who have power to drive

hard bargains. Bisso v. Inland Waterways, *supra*, 349 U.S. at 91, 75 S.Ct. at 632.

Not surprisingly, the government argues that the pilotage clause cases apply here while Stevens urges reliance on *Bisso* and *Dixilyn.* We agree with Stevens. Except for the fact that Captain Syre, a pilot, participated in causing the damage, the contract and facts here bear little resemblance to pilotage clause contracts or the cases construing them. In explaining the distinction between pilotage clauses and towage exculpation provisions, the Supreme Court has noted:

(1) A pilotage clause exempts for the negligence of pilots only; a towage clause exempts from all negligence of all towage employees;

(2) Pilots are regulated extensively by Federal and State authorities in regard to fees and other matters;

(3) As a rule pilots are free to act on their own best judgment.

Bisso v. Inland Waterways Corp., *supra*, 394 U.S. at 93–94, 75 S.Ct. 629. Moreover, towage contracts involve services in which a tug is in sole control because the tow is without power or crew; pilotage contracts involve vessels capable of moving under their own power. *Bisso, Id.* at 96, 75 S.Ct. 629. (Douglas, J., concurring); *compare* Sun Oil Co. v. Dalzell Towing Co., *supra.* Unlike pilotage contracts, the agreement here released the government from all risks, not just that of the pilot's negligence. Furthermore, the Exochorda was without power and Captain Syre was in command of both tugs used in the breaking out operation. Indeed, the damage resulted from the Exochorda's collision with a vessel moored on its port side, and stemmed from the inability of MARAD's tugs to hold the ship directly into the tidal current (Pre-Trial Order, Paragraph (3) (xvii)). Finally, Captain Syre, in contrast to tug pilots working on another's ship pursuant to pilotage contracts, can hardly be deemed to have been. in Stevens' employ rather than the government's. His exclusive control of tugboat maneuvers of a "dead" ship falls within the pattern of work done under towage contracts, not under pilotage clauses.

The government contends that the decision in S. W. Sugar Co. v. River Terminals, 360 U.S. 411, 79 S.Ct. 1210, 3 L. Ed.2d 1334 (1959) indicates that the Supreme Court is retreating from the *Bisso* doctrine. The argument is unpersuasive. It is true that the *Sugar* court refused to extend *Bisso* to a towage exculpatory clause embodied in a tariff filed with the Interstate Commerce Commission (ICC). However, its ruling was premised on the rationale that

"so long as the towboat's rates are at all times subject to regulatory control . . . the possibility of an overreaching whereby the towboat is at once able to exact high rates and deny the liabilities . . . can be aborted by the action of the I.C.C." S. W. Sugar Co. v. River Terminals, 360 U.S. at 418, 79 S.Ct. at 1215.

No such "pervasive regulatory scheme" (360 U.S. at 420, 79 S.Ct. 1210) exists here and there is no evidence of record that the Exochorda's purchase price reflected a reduction related to the exculpatory clause. (Defendant's Post-Trial Memorandum p. 13)

The government further argues *Bisso* cannot control here because (1) the sale of the Exochorda was instigated by Stevens' request that a ship be sold pursuant to a special "scrap" sale (Exhibit A); (2) a few dents on an unseaworthy vessel do not diminish the vessel's scrap value; and (3) unlike typical towage cases, the contract here involved the sale of a valuable first class passenger vessel for her scrap value in order to benefit an educational institution. We recognize that the vessel is worth more now than what Stevens paid for it and that the damage did not substantially affect the ship's intended use as a dormitory. On the other hand, the government's bargaining clout dictated the inclusion of the exculpatory clauses in the sale

agreement. And, as written, the contract left Stevens without a vestige of control over the breaking-out operation but responsibility nevertheless for any mishap which the government might cause. Such a contract cannot be enforced as a matter of public policy.

■ The government's remaining arguments as to liability fall by the wayside. It is argued that Stevens assumed the risk of "breaking-out," in consideration for the government's gratuitous services. However, as Stevens points out, it had two tugboats ready and willing to handle the operation but was required to permit MARAD to conduct the breaking-out. Similarly, the government's reliance on certain Uniform Commercial Code sections and federal statutes which authorize limitation of liability have no application to this case.

*B. Damages*

As noted above, the estimated cost fully to repair the dents to Exochorda's hull was $36,070., but Stevens actually spent only $5,296 to undo damage. The $36,070 figure included the proposed charge for three days drydocking estimated at $6,269 (Exhibit G and Pre-Trial Order Paragraph (3)(xx)). The government argues that Stevens is entitled only to the cost of repairs actually performed; Stevens seeks recovery of the full amount.

■ To begin with we agree that Stevens should not recover the proposed drydocking expenses. After the breaking-out incident, the ship was drydocked and converted to a dormitory. During the conversion, only the damage to the bulwarks and rails above the waterline was repaired. Drydocking was unnecessary for those repairs, although it was required for the conversion work. (Pre-Trial Order Paragraph (3)(xx)) The parties agree that repair of the entire damage could have been performed at that time. Under the circumstances, Stevens is not entitled to reimbursement for drydocking cost because this expense is not at-tributable to the repairs actually made, and represents funds that Stevens would have spent for conversion of Exochorda in any event. Skibs A/S Dalfonn v. S/T Alabama, 373 F.2d 101, 104 (2d Cir. 1967)

■ On the question whether the government can be charged for the remainder of the estimated full repair costs or only what Stevens actually expended, the applicable rule is that:

" . . . where repairs are *practicable* . . . the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred . . ." Baltimore, 75 U.S. 377, 385, 8 Wall. 377, 385, 19 L.Ed. 463 (1869) (emphasis added).

A reading of the relevant cases suggests that the word *"practicable"* refers to the possibility of restoring the damaged vessel to a seaworthy condition. *See, e. g.,* The Ames & Carroll No. 20, 66 F.2d 413 (2d Cir. 1933); Pennsylvania Railroad Co. v. Downes Towing Corp., 11 F.2d 466 (2d Cir. 1926). In the case at hand, Exochorda not only was incapable of travel; the contract of sale actually prohibited its use for transportation purposes. The only necessary repair here, then, was cosmetic, (i. e. visible) and in fact, only such repairs made. As Judge Augustus Hand stated in Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32, 33–34 (2d Cir. 1948):

" ' . . . where an injury can be perfectly repaired for all practical uses at slight expense, but, as in this case, cannot be placed in exactly the same condition as new, except by . . [work] at a very considerable expense, the court must hesitate in allowing damages on the basis of the latter mode of repair, especially where, as in this case, though a long time has elapsed, no such repair has been made.' . . . In other words, he is only entitled to an award that would give him a boat as seaworthy and practically serviceable as before and

not to an award, often much larger, sufficient to restore her to the identical condition she was in before the injury."

The cases relied upon by Stevens do not persuade us to the contrary. The ship was repaired for practical use as a dormitory. Stevens submitted no proof to establish that further repairs were necessary for any purpose to which the ship might be put. (See Plaintiff's Post-Trial Brief at pp. 30–37 and Defendant's Post-Trial Brief at pp. 6–8) Stevens is, therefore, entitled to damages in the amount of $5,296.

Submit judgment.

## MEMORANDUM

### Supplemental Opinion

 The parties disagree as to whether pre-judgment interest is payable on the judgment in this case. They are in accord that the issue is governed by a determination whether the provisions of the Public Vessels Act, 46 U.S.C. § 781 et seq. (PVA) or the provisions of the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. (SAA) control. The confusion engendered by the overlapping provisions of these Acts is well analyzed in Judge Gurfein's opinion in *Richmond Marine Panama, S. A. v. United States*, 350 F. Supp. 1210 (S.D.N.Y.1972). While the question is murky we find that the fact pattern at hand strongly suggests the applicability of the PVA. The damage caused here was clearly caused by the tugs which were public vessels, that is United States owned vessels, which were not merchant ships. The plaintiffs themselves have recognized the possible applicability of the statute by having brought suit under both the SAA and the PVA.

In the circumstances we apply the rule of the PVA that no interest is allowable on any claim up to the rendition of judgment. Post-judgment interest appears to be payable in accordance with the provisions of the SAA at the rate of 4% by virtue of the SAA's partial incorporation by reference in the PVA at 46 U.S.C. § 782. Even if this were not so, we see no reason why a higher rate should be paid than the standard established in the SAA.

Plaintiff's application for payment of costs and disbursements is denied. No special circumstances exist in this case which warrant such an award.

Judgment is being entered concurrently herewith in accordance with this memorandum.