VIRGINIA INTERNATIONAL
TERMINALS, INC.,
Plaintiff,

v.

M/V KATSURAGI, in rem,

and

TAMA LAKE SHIPHOLDING S.A.
PANAMA, Owner, Hachiuma Steam-
ship Co., Ltd., Operator, and NYK
Line 1993(S) Pte. Ltd. (Nippon Yusen
Kaisha, Ltd.), Charterer, in personam,
Defendants and Third–Party Plain-
tiffs,

and

Moran Towing Corporation, and
Ronald L. Ainsley, Third–
Party Defendants.

No. 2:01 CV941.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 10, 2003.

Carter T. Gunn, John Morgan Ryan, Vandeventer Black LLP, Norfolk, VA, for Plaintiff.

Rice Arthur Jett, Jr., Davey & Brogan, P.C., Mark T. Coberly, Vandeventer Black LLP, Norfolk, VA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIEDMAN, District Judge.

This matter is before the court following a bench trial pursuant to the court's admiralty jurisdiction under 28 U.S.C. § 1333. During a docking maneuver on May 12, 2001, the M/V KATSURAGI allided with a pier located at Norfolk International Terminals (NIT). The pier was part of a marine terminal operated by Virginia International Terminals, Inc. (VIT), the original plaintiff in this action. VIT sued the KATSURAGI in rem and its owners and operators in personam, who in turn filed a third-party complaint against Moran Towing Corp., whose tugs were to assist the ship, and the docking pilot in charge of the maneuver, Ronald Ainsley. VIT reached a settlement with the owners and operators of the KATSURAGI for damages to the pier in the amount of $434,915.40. The total cost incurred to repair damage to the KATSURAGI amounted to $346,555.08. The third-party plaintiffs claim contribution from the third-party defendants, therefore, in the amount of $781, 470.48,

which the parties agree are fair and reasonable provable damages.[1] The third-party action was tried before the court on August 19 and 20, 2002. The parties filed closing briefs, and arguments were heard on October 31, 2002. Having carefully reviewed the record, the credibility of the witnesses, the parties' stipulations, and the applicable law, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

The M/V KATSURAGI is a containership with an overall length of 292.15 meters. It is owned by Tama Lake Shipholding. Hachiuma Steamship Co. is the managing agent of the ship for Tama Lake, and Nippon Yusen Kaisha is the time charterer of the KATSURAGI. All are affiliates of the NYK Group and are collectively the third-party plaintiff in this action. The ship regularly calls on ports along the eastern seaboard, including Hampton Roads on five occasions prior to the allision and at least four times afterward. The ship is equipped with a single main engine and propellor aft and a forward bow thruster. Bow thrusters are employed during docking maneuvers to provide added lateral movement in tight spaces. The bow thruster was inoperable on the day of the allision, and all relevant parties were aware of this fact.

On May 12, 2001, the KATSURAGI was to dock at NIT North Berth, a container pier running 1500 feet approximately north-south along the shoreline of the Elizabeth River, roughly parallel and east of the main ship channel, Norfolk Harbor Reach. The ingress and egress to the

---

1. For convenience, the third-party plaintiffs, all affiliates of the same company, will be referred to collectively as Katsuragi or "the plaintiff," and the third-party defendants Mor-

an and Captain Ainsley will be collectively referred to as "the defendants." VIT is not mentioned in the remainder of the opinion in its capacity as the original plaintiff.

North Berth is through a short, dredged approach channel, its north side defined by a pier running perpendicular to the shore and Norfolk Harbor Reach. Three red nun buoys, numbered "2", "4", and "6", demarcate the south-southeastern outer limits of the approach channel, beyond which the KATSURAGI and its assisting tugs were unable to pass due to the shallow water depth.

During the docking maneuver, the weather was clear, visibility was ten miles, and winds were from the north-northwest at ten miles. The flood current was half a knot. Neither the weather nor water conditions had a noticeable effect on the docking operation that day.

Moran Towing provides tugs to assist ships docking in Norfolk. By agreement, it was to provide assistance to the KATSURAGI when it docked at NIT North Berth. Prior to arrival, an agent for the KATSURAGI called Moran to report its expected time of arrival and to arrange for tugs to help dock the ship. Accordingly, Moran arranged for two tugs that it owned and operated to be available for the docking maneuver, the CAPE HENRY and DRUM POINT.

Moran provided tug services to the KATSURAGI pursuant to a contract that contained a standard "Pilotage Clause." The Pilotage Clause stated in relevant part:

> We do not furnish pilots or pilotage to vessels making use of or having available their own propelling power, so that whenever any licensed pilot, or a captain of any tug which is furnished to or is engaged in the services of assisting a vessel making use of or having available her own propelling power, participates in directing the navigation of such vessel, or in directing the assisting tugs, from on board such vessel or from elsewhere, it is agreed that he becomes the borrowed servant of the vessel assisted .... Any such service performed by such person is beyond the scope of his employment for us and neither those furnishing the tugs or lending any such person, nor the tugs, their owners, agents, charterers, operators, or managers shall be liable for any act or omission of such person. Ex. 46.

Moran has an agreement with the Association of Virginia Docking Pilots to use its members as docking pilots on ships for which Moran provides tug assistance. The association's pilots are not tug captains, nor are they employees of Moran. They are docking pilots alone, paid directly by ship owners for their services, in addition to an annual fee paid by Moran.

The docking pilots' association utilizes a standard clause in the invoices or pilot tickets it issues pursuant to supplying pilotage services to ships. The clause acts as a waiver of liability for acts of simple negligence arising in conjunction with the handling of the particular ship and the issuing of orders to assisting tugs. The ticket states in relevant part:

> [N]either the owners nor the operators of a vessel making use of or having available her own propelling power will assert any personal liability to respond in damages, including any rights over against the pilot for any damage sustained or caused by the vessel, even though resulting from the pilot's negligence, in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting services and/or in respect to the handling of such vessel; excepting, however, the personal liability or rights over against the pilot for his willful misconduct or gross negligence. Ex. 71.

Such a pilot ticket was used with regard to the docking of the KATSURAGI. See Ex. 71, ticket 20168.

On the morning of May 12, 2001, at approximately 9:42,[2] the KATSURAGI arrived in the area of Cape Henry. Virginia state pilot Captain John Phillips boarded the ship and directed the vessel into the harbor until the ship was just off the NIT North Berth facility, in Norfolk Harbor Reach. The passage from Cape Henry to Norfolk Harbor Reach was uneventful. *See* Phillips Dep. at 28.

The Moran dispatcher called Captain Ainsley, the member of the pilot association on duty that morning, and informed him that he would be docking the KATSURAGI. This call was made approximately ninety minutes prior to the actual time Ainsley would be docking the ship. Captain Ainsley had docked the KATSURAGI on one previous occasion and has done so since the allision at least once more. *See* Ainsley Test. Ainsley was given the relevant details of the ship and the job, including, most importantly, that he would have two tugs to work with and that the bow thruster was inoperable.

Ainsley testified that over the course of his career he had docked ships over 12,000 times, including ships the size of the KATSURAGI on a regular basis. Given his experience, Ainsley felt that under the circumstances two tugs would be sufficient assistance. He also formulated only a general plan of how the docking maneuver would occur. Based on the unique circumstances present in any docking operation, it would have been unnecessary and, perhaps, ill-advised to formulate an elaborate plan. The final details would wait until he was onboard the ship. Clearly, however, the docking maneuver required the ship to complete an "S" turn. The ship would proceed down Norfolk Harbor Reach, turn to port in order to enter the entry channel to the pier, proceed past the red buoys to the starboard side, and having cleared them, turn to starboard to sidle up to the pier. Once roughly parallel with the pier and stopped, Ainsley would then employ the tugs DRUM POINT and CAPE HENRY to push and pull the ship into its final position along the pier. *See* Ainsley Test.

Just after 11:00, Captain Ainsley rode out to the KATSURAGI aboard the CAPE HENRY and boarded the ship when it was just above buoys 9 and 10 in the harbor reach off the Norfolk Naval Station. *See* Lucas Test.; Ainsley Test.; Phillips Dep. at 29. Ainsley was on the bridge by 11:19.[3] Also present on the bridge were the ship's captain Atushi Kadoya, state pilot Phillips, Third Officer Johnny Jardin, Junior Third Officer Mori, and a helmsman. Ainsley introduced himself to the bridge officers and familiarized himself with the ship's particulars.

Ainsley then issued his first orders, a combination of steering, engine, and tug orders. The exact sequence is unclear and immaterial. Ainsley issued the following orders: 1) He ordered the CAPE HENRY to proceed to the starboard side of the ship and put up a line; 2) he issued a slow ahead engine order at 11:24; and 3) he gave a steering order of hard to port.[4] The purpose of the engine and steering orders were to turn the ship into the en-

---

2. All the times noted in this opinion refer to A.M.

3. There is some debate as to the exact time. *See* Ex. 39 (report of state pilot Phillips, stating 11:15); Kadoya Dep. at 22 (stating 11:19); Ex. 9 (report of officer Johnny Jardin stating 11:19). The court's decision is not affected by this factual dispute. It is clear that Ainsley was on the bridge no later than 11:19.

4. It appears from Ainsley's testimony that the hard to port was his first ship order. There is some ambiguity as to Ainsley's first engine order—whether it was a stop order at 11:23 or the slow ahead at 11:24. This dispute is immaterial to the court's decision.

trance channel. His order to the CAPE HENRY was for the purpose of positioning her to compensate for the inoperable bow thruster when the time came to maneuver the ship into its berth. *See* Ainsley Test. He also ordered the tug DRUM POINT to drop back on the port quarter and start pushing the ship ahead through the turn. *Id.*

The method by which Ainsley gave his orders was as follows: Ainsley would give an order to Captain Kadoya who would relay the order to Jardin, who in turn, would relay the order to Mori or the helmsman. Mori was responsible for executing engine orders, and the helmsman was responsible for steering orders. The orders would be repeated back along the chain of command, although there is some dispute as to whether this was done faithfully for each order. Ainsley testified that normally orders are repeated back to him but not always. He did not recall what occurred that day. Pilot Phillips' deposition indicates that he was hearing the orders being repeated back, though it was not put to him whether this occurred every time. *See* Phillips Dep. at 18–19.

Following the slow ahead order at 11:24, Ainsley gave additional orders increasing the ship's speed, apparently in order to increase the rate of turn to port. *See* Ainsley Test. During this time frame, the ship turned into the channel at about six knots, which was somewhat faster than normal. *See* Lucas Test. As it came through the turn, the ship lost speed and proceeded into the channel at just over 3 knots. *See* Phillips Dep. at 17. Significantly, the turn was too wide, as the ship's heading was taking it directly at or quite near to channel buoys 2 and 4. *See* Ex. 17

(sketch by Captain Kadoya); Ex. 39 (sketch by Phillips).

It appears that Ainsley gave the engine a kick ahead and ordered the ship's rudder hard to port to move it off the direction of the buoys. *See* Phillips Dep. at 18; Kadoya Dep. at 32. The kick ahead was the 11:26 full ahead order indicated on the engine bell logger, and the hard to port order immediately followed it. *See* Ex. 22; Kadoya Dep. at 32. The ship's bow did move off the buoys and it passed roughly parallel to them. *See* Ex. 17; Ex. 23; Ex. 39. The ship's speed as it passed the buoys was between 3 and 4 knots. *See* Ex. 23.

At this point, the ship was approaching the pier and needed to slow down and start the turn to starboard. To accomplish both requirements, Ainsley ordered the engine to half ahead and then stopped at 11:27. He followed with a steering order of hard to starboard. *See* Phillips Dep. at 20; [5] Ex. 39 (Phillips report); Kadoya Dep. at 46; Ex. 23.

At roughly the same time these events were occurring, Ainsley ordered the tug DRUM POINT to come around the ship's stern to the starboard quarter and put up a line. As noted, the ship began passing closely by the number 2 and 4 channel buoys, within thirty to forty feet.[6] Out of concern, Ainsley and Captain Kadoya had moved out onto the starboard bridge wing to watch the ship approach and pass the buoys. Inside the bridge remained Phillips, Jardin, Mori, and the helmsman. Due to the ship's close proximity to the buoys, which demarcated the outer limits of the channel, the tug DRUM POINT was unable to come around to the starboard quarter and put up a line as ordered.

---

**5.** Phillips stated that he did not actually hear Ainsley give this order, but instead, heard a ship's officer repeating the order.

**6.** The court relies on the testimony of the two tug captains in this respect. Captain Lusk of the DRUM POINT testified that the distance was thirty feet, whereas Captain Lucas of the CAPE HENRY stated it was forty feet.

Instead, the tug took a position off the ship's stern, waiting for it to clear the buoys. The DRUM POINT never got its line up. *See* Lusk Test. The evidence clearly indicates that the KATSURAGI was closer to the buoys than it should have been. *See. e.g.,* Ex. 23 (Kadoya report); Davis Test.

Simultaneously, as the ship was making its turn into the entrance channel and passing by red buoys 2 and 4, the CAPE HENRY was on the starboard bow attempting to secure a line to the ship as ordered earlier in the maneuver. It is the standard practice to use a heaving line, and messenger lines are the exception to this rule. *See* Johannsen Test. (plaintiff's expert). This process was taking longer than it should have as the tug crew was unable to heave a line up to the ship deck, owing to the KATSURAGI's great height.[7] Instead, a messenger line needed to be sent down to pull up the tug's line. The KATSURAGI crew members on deck did not immediately recognize this fact, causing the delay. Bill Lucas, the tug's captain, may have radioed this fact to Ainsley. *See* Lucas Test.[8] Once the messenger line was lowered, the KATSURAGI crew needed to pull the line up. This process also took longer than expected. Apparently, the line stopped midway up momentarily, perhaps owing to its weight and the limited number of crewmen on deck pulling the line up. By 11:28, the line was being made fast but was not yet secure.

There is some confusion regarding engine and steering orders given around 11:28, which followed a one-minute period in which the engines were stopped and the ship was slowing. The deposition testimony of pilot Phillips and Captain Kadoya indicate that Ainsley ordered the ship to steer hard starboard in order to turn the ship parallel to the pier. *See* Phillips Dep. at 40; Ex. 23; Ex. 31. More specifically, Phillips stated that Ainsley ordered a "kick ahead" and hard starboard. Phillips Dep. at 20; Ex. 39. The engine bell logger indicates a slow ahead order at 11:28. Ex. 5. In their depositions, Jardin and Kadoya stated that Ainsley gave this order. Jardin Dep. at 66; Kadoya Dep. at 33. There is some doubt as to whether this is true. Phillips could not hear Ainsley and, therefore, his testimony is based on what he heard other men in the chain repeating, which may have been incorrect. *See* Phillips Dep. at 19–20. Additionally, numerous reports made following the accident do not mention this order, though they are not entirely complete accountings. *See* Ex. 9; Ex. 18; Ex. 31; Ex. 33.

Ainsley denies giving both the ahead order and the steering order of hard starboard. He testified that he ordered the ship engine astern at 11:28, not ahead, and never gave a turning order. *See* Ainsley Test. While much was made of the factual dispute regarding the engine order at trial, the court's decision does not require it to resolve this question.[9] The

---

7. This conclusion, as well as the other references to the problem with the line, are drawn from the testimony of Captain Lucas, captain of the CAPE HENRY, and Todd Rich, Chief Engineer on the tug, who was on watch and attending to the line when these events transpired.

8. Ainsley does not recall this occurring, but his testimony indicates some hesitancy to commit to this answer. Lucas was quite clear in stating that he radioed to Ainsley regarding

this problem. The court discusses this issue further in its legal conclusions.

9. Both parties have asserted why their respective contention as to the engine and steering orders would make sense at this juncture. According to Phillips, who believed the orders were ahead and hard starboard, such orders were intended to start the turn into the pier and to increase the maneuverability of the ship by "increasing the revolutions," in much the same way Captain Ainsley unquestionably ordered the ship ahead when turning it to

court does, however, find that Ainsley gave the steering order of hard to starboard. The depositions of Phillips and Kadoya in this respect seem to be undeniably credible. Kadoya's statement that Ainsley ordered the ship to turn was based on his personal belief as well as confirming this with the crew members on the bridge following the accident. Officer Jardin also stated that a starboard order was given, though a minute prior to what Kadoya concluded. *See* Jardin Dep. at 65. While it is possible for the court to question whether an order given was astern or ahead, the court does not have a similar problem debating whether a steering order was given at all. There is much more conflicting evidence suggesting a problem with the engine order than there is with regard to the steering order. While the court has made a finding as to the steering order, the legal conclusions in the court's opinion would be unaffected by the alternative finding in this respect.

Regardless of what particular orders were given, the ship began to turn to starboard, but its rate of turn was too slow. It was apparent that the ship did not have enough distance between itself and the pier to make the turn. Ainsley ordered the tug CAPE HENRY to back on its line, at which point he was informed that the tug could not because the line was not yet fast. In short order, the line was made fast and the tug began backing. By this time, the distance to the pier was quite short, several hundred feet or less. *See* Lucas Test.; Rich Test. While the CAPE HENRY was backing, the ship's engine were ordered half, full, and crash astern in rapid succession.[10] At 11:30, the ship allided with the pier.

## CONCLUSIONS OF LAW

### A. General Legal Principles

#### 1. *The Burden of Proof*

 The plaintiff declares, correctly, that where a ship hits a stationary object, there arises a presumption, commonly known as the Oregon Rule, that the ship was at fault. *See The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895). The plaintiff claims that, in addition to the KATSURAGI, this presumption is imputed to the tugboats assisting in the docking operation and, consequently, Moran. In this respect, the court cannot agree.

There is no binding precedent from the Fourth Circuit on this point. While the plaintiff cited *GYPSUM QUEEN—Tug PEERLESS,* 1953 A.M.C.2071 (E.D.Va. 1953), which seems to support its claim, that case arose in a different historical context and is distinguishable from the instant lawsuit. There, the docking pilot was also the captain of the tug assisting in the maneuver. The court held that not only was the docking pilot presumed negligent, but his tugboat was liable in rem as well. "The collision of the *GYPSUM QUEEN* with the stationary pier while she was under the con and control of the tug captain, aided by his tug, raises a presumption of negligence on the part of both the tug captain and his tug ...." *Id.* It is clear to the court that the presumption of negligence was imputed to the tug by virtue of its relationship to the tug captain who was directing the maneuver. Of additional importance are the cases the court in *Gypsum Queen* relied on for its holding: *The Severance,* 152 F.2d 916 (4th Cir. 1945), and *Patterson Oil Terminals v. Tug*

port into the entrance channel. *See* Phillips Dep. at 40. An astern order, as Ainsley claims was given, would slow the ship as needed, and simultaneously cause the ship to turn itself to starboard without use of the

rudder due to the direction the ship's propellor turns. *See* Ainsley Test.

**10.** It appears that Ainsely gave the first two orders and Kadoya the final order.

PORT COVINGTON, 1952 A.M.C. 1745 (E.D.Pa.1952).

The Severance does not stand for the proposition that the presumption of negligence attaches to an assisting tug. In that case, the court held that the presumption attached to the docking pilot. While the court also found the tug company negligent for supplying an insufficient number of tugs, the court made no mention of any presumption of negligence attaching to the assisting tug. Similarly, the presumption of negligence in Patterson Oil Terminals, a case the plaintiff also cites, appears to have attached to the towing company defendant because the docking pilot directing the ship was its employee. In fact, the court opinion made no mention of the presumption attaching by way of the assisting tugs. The court was quite clear that "[t] the presumption of negligence ... operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision." Patterson Oil Terminals, 1952 A.M.C. 1745. From this comment and the court's discussion, it appears the imputation of negligence to the tug company was a result of the docking pilot's association with the tug company and the failure to supply an additional tug, not the involvement of the assisting tugs.

It makes sense to impute negligence to tug companies where the docking pilot is a tug captain or, particularly, where the ship is not operating under its own power, but instead, is being towed and directed by the tugs. In fact, the case law addressing the liability of tugs under this presumption of negligence is concerned with instances where the tug is providing towing services to a dead ship and the tug is the motive power in the flotilla and its "dominant mind." See Alex Parks and Edward Catell, The Law of Tug, Tow, and Pilotage 21 (3d ed.1994) (collecting cases). Such cases are easily distinguishable from the instant

facts, and the court believes that GYPSUM–QUEEN is inapplicable. Today, ships employ docking pilots independently of assisting tug boats, and the tugs were only assisting the KATSURAGI in its docking maneuver, rather than directing the maneuver of a powerless ship.

Most importantly, the presumption of negligence serves the purpose of favoring the party who has been injured, like the pier owner in GYPSUM QUEEN, against the ship which hit it. In the instant case, the plaintiff asks the court to favor the offending ship over its assisting tugs where the KATSURAGI was operating under its own power and the majority of the operation was performed without use of the tugs. All orders were given by Ainsley, operating as the agent of the plaintiff. To hold that the presumption of negligence attaches to the tugs in this instance would effectively negate the purpose of Moran's pilotage clause. There is no sound reason to apply the presumption of negligence in third-party actions for contribution between offending ships and their assisting tugs, and the court cannot find any case law where this actually occurred.

■ Decisions like GYPSUM QUEEN, where the presumption of negligence is applied to tug companies in addition to the ship itself, are distinguishable on this basis alone. Courts in such cases were addressing civil actions between the injured party and the offending ship and those managing its movement, not actions among parties responsible for the errant ship. In these instances, the pilotage clause is not a factor because such a contractual arrangement between a tug company and a ship is not binding on a third-party, like the owner of a pier damaged in an allision. See Patterson Oil Terminals v. Tug PORT COVINGTON, 1952 A.M.C. 1745 (E.D. Pa.1952). The court concludes, therefore, that the presumption does not inure to the

benefit of a defendant ship or shipowner in its third-party action for contribution or indemnification.

■ Alternatively, the court holds that even if the presumption were to apply, it has been rebutted. As the court has already stated, the tugs played a minimal role in the docking operation. The DRUM POINT was prevented from participating at the crucial moment by negligence acts attributable to the KATSURAGI crew or Ainsley. As the court discusses further below, the CAPE HENRY's actions were not a cause of the allision. Furthermore, the defendants have offered a plausible alternative explanation for the allision that alleges negligence on the part of the KATSURAGI crew.

■ Without the benefit of the presumption, traditional common law principles of negligence apply to claims under general maritime law. *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir.2000). To succeed, the plaintiff would have to establish the following elements by a preponderance of the evidence: that the defendant owed the plaintiff a duty, that this duty was breached, and that a causal connection existed between the breach and the plaintiff's injury. *See In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir.1991); *Naglieri v. Bay*, 93 F.Supp.2d 170 (D.Conn.1999); *SeaRiver Maritime, Inc. v. Industrial Medical Services*, 983 F.Supp. 1287 (N.D.Cal.1997).

### 2. *Limitations of Liability*

■ As noted in the court's findings of fact, both defendants had provisions in their agreements with Katsuragi limiting their liability. For Moran, its pilotage clause stated that the company could not be held liable for the docking pilot's acts. The Virginia Association of Docking Pilots' pilot ticket, if valid, would absolve a docking pilot of all liability arising from acts of simple negligence. Such limitations of lia-

bility have been commonly enforced since the Supreme Court recognized the validity of pilotage clauses in *Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932). *See, e.g., Reederei Franz Hagen v. Diesel Tug Resolute*, 400 F.Supp. 680 (D.Md.1975). The plaintiff has not presented any evidence challenging the validity of these contractual terms and has acted at all times as if the terms were valid, arguing issues of liability that would fall outside the scope of such provisions. Additionally, the terms are standard in the industry, and the facts of this case do not permit the court to apply any of the narrow exceptions that courts have carved out to limit the power of such terms. Accordingly, the court concludes that both contractual provisions are valid and enforceable.

■ Because the court finds that the towage agreement pilotage clause and the limitation of liability in the pilot ticket are valid and enforceable, the plaintiff's avenues for recovery are narrowed in a number of respects. Not only must the plaintiff prove the standard elements of negligence—duty, breach, causation, and damages—it must also show a legal right to compensation for such damage. In light of the contractual terms, to recover damages from the result of any negligence attributable to Captain Ainsley, the plaintiff must demonstrate that Ainsley was either grossly negligence in the execution of the docking maneuver or that any simple negligence was committed outside the scope of the docking maneuver. Furthermore, any negligence attributable to Captain Ainsley does not attach to Moran; therefore, only acts of negligence by the tugs and their crews during the docking maneuver can result in Moran's liability.

The court notes from the outset of its legal analysis that the plaintiff withdrew

any claims that Captain Ainsley was grossly negligent in carrying out the docking maneuver during its closing argument. With these considerations in mind, it is clear that neither Ainsley nor Moran can be liable for *any* negligent acts attributable to Ainsley during the course of the docking maneuver. Accordingly, the court's discussion of Ainsley's potential negligence during the actual maneuver will be limited and instead focus on acts falling outside the scope of the pilot ticket prior to his taking command.

## B. Claims Against Ainsley

### 1. *Negligence occurring outside the scope of the pilot ticket*

 The plaintiff suggests that Captain Ainsley was negligent in failing to formulate a proper docking plan prior to taking command of the KATSURAGI and that he failed to communicate with the tug boat captains any plan as to how the docking maneuver would occur. Because this alleged negligence occurred prior to his taking command of the KATSURAGI, the plaintiff contends that such negligence would be outside the scope of its waiver of liability pursuant to the terms of the pilot ticket. The court finds this argument unconvincing.

Courts have not been terribly receptive to the notion that a docking pilot should have a detailed plan formulated prior to going onboard a ship. Courts recognize that the most crucial factors of any plan must be left undetermined until the docking pilot is onboard and is aware of the specific characteristics of the ship he is piloting and the conditions presented by the ship's surroundings—the character of the water and wind, the ship's location, etc. Consequently, courts have held that any negligence relating to a flawed docking plan does not occur during the plan's conception but, instead, in its actual implementation, and is therefore covered by contractual limitations of liability. *See A/S Atlantica v. Moran Towing and Transp. Co.*, 498 F.2d 158 (2d Cir.1974); *Farrell Lines, Inc. v. Birkenstein*, 207 F.Supp. 500 (S.D.N.Y.1962). The court finds such precedent to be persuasive and concludes that even if Ainsley's failure to formulate a detailed plan and share it with the tug captains was negligent, it falls within the scope of the pilot ticket.

### 2. *Failure to Request Additional Tugs*

 Next, the plaintiff contends that Ainsley was negligent in failing to request additional tugs to complete the maneuver. Due to the ship's inoperable bow thruster and the alleged weak power of the tug DRUM POINT, the plaintiff asserts that an experienced docking pilot like Ainsley should have requested an additional tug to assist. This claim fails because the evidence presented indicates that the docking operation could have been successfully carried out with the assistance of only two tugs.

While the plaintiff points out that Moran had employed three tugs to dock the KATSURAGI on prior occasions, it is also clear that on other occasions only one or two tugs had been employed to dock the ship successfully. Aside from the bow thruster, the plaintiff has presented no evidence of factors necessitating additional tugs. With regard to the inoperable bow thruster, state pilot Phillips was not concerned that only two tugs were employed to assist the ship. His deposition states that he did not feel it was unsafe to use two tugs to dock a ship of this size having an inoperable bow thruster, and he had "seen it done many times." Phillips Dep. at 27. Nor did Captain Kadoya express any concern as to the number of tugs. He remained in command of the ship at all times and could have requested additional tugs if the number employed was clearly insufficient. *See*

*Patterson Oil Terminals v. Tug PORT COVINGTON*, 1952 A.M.C. 1745 (E.D.Pa. 1952). The defendants' expert testified that two tugs were sufficient and that he had personally docked ships the size of the KATSURAGI using only one or two tugs. Though the plaintiff's expert testified that there were an insufficient number of tugs, it was never presented clearly to the court, if at all, just what effect this had on the maneuver or how it contributed to the accident.[11] The court concludes that Ainsley was not negligent for failing to request additional tugs.

### 3. Conclusion as to Ainsley's Liability

Because these two claims fail, Ainsley cannot be liable to Katsuragi for the allision. Though the court concludes that he may have been negligent in a number of respects in regard to the docking of the ship, such acts could only have occurred during the docking operation and are covered by the contractual limitation of liability. Because the plaintiff has abandoned any claim that Ainsley's conduct was reckless or grossly negligent, the court does not address whether Ainsley's negligence was so extreme.

### C. Plaintiff's Claims Against Moran

#### 1. Failure to Assign an Adequate Number of Tugs

The court has already discussed this claim with regard to Ainsley, and the analysis is little different for Moran. The plaintiff alleges that Moran was negligent in not assigning three tugs to assist in the docking maneuver. Additionally, the plaintiff claims that Moran also was negligent in assigning a tug, the DRUM POINT, having inadequate power. This alleged negligence would not be covered by the pilotage clause. While the

court believes that there is a duty to supply an adequate number of tugs, *see, e.g., California v. the Jules Fribourg*, 140 F.Supp. 333 (N.D.Cal.1956), the court concludes that Moran was not negligent in this respect. As discussed above, evidence offered at trial and in the depositions indicates that there was nothing unusual about the number of tugs used to dock the KATSURAGI on this occasion.

As to the actual execution of this particular docking operation, the court notes that one of the tugs was a bystander to the operation having been prevented from coming alongside the ship to put up a line, and the other tug was late in getting its line up and was of little help in the final crucial minutes of the accident. Any testimony supporting a claim that there were not enough tugs would have to demonstrate that even if these two problems had not occurred, the allision would still have occurred and this would have resulted in some way from an inadequacy of tug power. No such proposition was ever put forth, nor does the court believe that such a conclusion could have been drawn.

Finally, it cannot be alleged that the DRUM POINT's insufficient power contributed to the accident. It may have been negligent to assign a weak tug to this job, but such lack of power was never shown to have contributed to the accident. The DRUM POINT was essentially a bystander to the accident, owing to the fact that the KATSURAGI's proximity to the buoys on its port side prevented the tug from coming around and positioning itself to help in the maneuver. While the DRUM POINT may have been able to help avert the allision, it was not in a position to do so. Whatever negligence may have rendered the DRUM POINT useless in this

---

11. Nor does the court weigh the plaintiff's expert's testimony as heavily as that of the defendants'. Captain Frank Reinbold, the de-

fendant's expert, clearly had more experience serving as a docking pilot on ships of a size comparable to the KATSURAGI.

respect is attributable either to Katsuragi or Ainsley. In either case, Moran is not implicated.

### 2. *Failure to Maintain a Proper Lookout*

 Katsuragi alleges that the CAPE HENRY was negligent for failing to keep a proper lookout in violation of Rule 5 of the Inland Rules. Such negligence would trigger the Pennsylvania Rule, which relates to a ship's violation of a statutory rule intended to prevent collisions. If a ship violates such a statute, the burden rests on the ship to prove that its violation could not have been a cause of the accident. *See Pennsylvania*, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1873). The court finds this rule inapplicable for some of the same reasons that the plaintiff's presumption of negligence argument should not apply. Once again, this rule is appropriate to place a burden of proof on the ship that is involved in the accident and has violated the rule. Here, such a rule would apply to the KATSURAGI itself. With regard to tugs, the rule has been applied where the tug is the sole source of motive power and control of a flotilla, as in a towage arrangement, or is operating independently. *See Farrell Lines v. S. S. Birkenstein*, 207 F.Supp. 500, 506–07 (S.D.N.Y.1962) (listing cases). In the instant case, the CAPE HENRY was merely assisting the KATSURAGI. This was not a towage arrangement, and the CAPE HENRY had no role in guiding the ship. The court is unable to find, nor do the plaintiffs cite, any case in which the rule has been applied to a tug merely assisting a ship, nor does the court believe the rule should be applied in such a context. *See id.* (declining to apply rule in a similar context).

 Furthermore, the plaintiff's allegation is that the CAPE HENRY's captain should have communicated to the ship his concern that its speed was too fast. Not only does this have nothing to do with the duty to maintain a lookout, but there was ample testimony at trial that it is not the tug captain's place to weigh in with his opinion regarding how the maneuver is being conducted. In fact, he is, generally, supposed to keep the line of communication clear to allow the captain to issue his orders. The tug captain is there, essentially, to follow orders, and he normally will not have the experience or perspective to judge when a maneuver is being improperly conducted. There were two observing experts on the bridge authorized to intervene at any time they felt the docking pilot was acting in an unsafe manner—the state pilot and the ship's captain. It is not incumbent upon a tugboat captain to warn of conditions that are known to the ship's officers and docking pilot, such as its speed. Finally, the evidence is unclear as to whether the KATSURAGI was even proceeding at an unreasonably excessive speed. No duty exists on the part of the assisting tugboat to inform the docking pilot of his opinions under the set of facts present in this case.

### 3. *The CAPE HENRY's Failure to Get a Line Up*

Katsuragi's most important claim is that the tug CAPE HENRY and its crew were negligent in regard to the failure to have a line up when Ainsely ordered her to back full. As described in the court's findings of fact, upon assuming command of the KATSURAGI, Ainsley ordered the tug to go to the starboard side and put up a line. As the ship neared the pier and he ordered the tug to back full on her line, the tug's response was that it could not because the line was not yet fast but was being made fast.

Katsuragi asserts that the CAPE HENRY was unable to perform when Ainsley

needed her to perform, and that this failure contributed to the allision. Katsuragi also states that the CAPE HENRY's captain should have communicated to Ainsley the critical fact that the crew was having trouble securing the line in a timely fashion. In summary, the claim of negligence regarding the failure to secure a line has two parts: First, that the failure to get the line secured in time was a negligent act attributable to the tug and her crew; and second, that there was a duty to apprise the docking pilot that a line was not secure and that the CAPE HENRY breached this duty. If either instance truly constitutes negligence on the part of the tug and its crew, the plaintiff must then demonstrate that such negligence was a cause of the allision.

### a. The Operation Itself

■ As noted in the court's findings of fact, there was a significant delay in getting a line up to the ship from the CAPE HENRY and making it fast. While the plaintiff seeks to blame the crew of the CAPE HENRY for this problem, the court concludes that the significant delay was a result of negligence on the part of the KATSURAGI crew. It appears from the testimony that the general rule is to heave a line up to the deck of a ship from the tugboat. *See* Johannsen Test. This technique is not always possible owing to the great height of some ships. In such instances, a messenger line must be lowered from the ship and used to take up a line from the tug. Such was the problem with the KATSURAGI. The CAPE HENRY attempted to get its line up and could not. It also seems that no messenger line was immediately forthcoming from the ship and that there was some delay even after it was clear that such a line was needed.

The court concludes that where a ship of such great height as the KATSURAGI requires a line up from a tug, the ship's crew should always know that this may require a messenger line and be prepared to supply one. The burden should not be upon the tug to attempt to heave a line up only to have this fail and then wait for the ship's crew to notice the problem and lower a messenger line. Instead, the ship's crew should have a good deal of experience dealing with this situation and know the particular problems inherent in their ship. Additionally, the testimony of Captain Lucas and Todd Rich indicates that there was a great deal of delay in getting the messenger line up once it had been lowered to the tug, and this delay would be attributable solely to the ship's crew. In no manner can the court conclude that the delay with the line was the fault of the CAPE HENRY and its crew. There is simply no contrary evidence to support the notion that the tug was at fault, for example, that she was late in positioning herself on the starboard side of the ship.

### b. Duty to Inform Ainsley That the Line Was Not Fast

■ Alternatively, the plaintiff contends that irrespective of any duty to get the line up, the tug had a duty to inform Ainsley of any delay in getting the line up. According to this theory, Ainsley assumed the tug was fast and relied on this assumption when making decisions as to ship orders. He needed the tug when he ordered her to back on the line and had he known the tug was not yet fast, Ainsley would have initiated different orders that would have prevented the allision. The plaintiff argues that the order to back full on the line was an attempt to turn the bow to starboard and away from the pier and that the failure to back when ordered affected the rate of turn, contributing to the allision. Simultaneously, the plaintiff asserts that Ainsley testified he would have begun backing the ship much earlier had he known the tug was unavailable to assist

him. The court addresses these contentions.

First, it is evident that Ainsley was not trying to turn the ship with the tug at this point. His testimony on this issue indicates as much. *See* Trial Tr. at 71–74. Other sections of Ainsley's testimony also support this conclusion. It is clear that Ainsley's plan for the tugs was to get the KATSURAGI stopped and roughly parallel to the pier and then use the DRUM POINT and CAPE HENRY to push and pull the ship into position alongside the pier. In other words, his primary use for the CAPE HENRY was at the end of the operation, as a fill-in for the bow thruster, which is employed for lateral maneuvering when the ship is almost stopped. Earlier in the operation, the tug was to be positioned along the boat for pushing, if needed. As Ainsley noted, when a tug is pushing, it does not need its line up. Trial Tr. at 70. At the point in time when Ainsley ordered the tug to back, the ship was still in its approach to the pier. Ainsely's intent was to complete the greater portion of the starboard turn using the ship's own power, and he did not yet need the tug to have its line up for purposes of assisting the ship's lateral movement. If the tug was to turn the ship at this point, it would have pushed out to a position at a right angle to the ship, and the order to the tug would not have been to back alongside the ship.

The court notes that there is a legitimate question as to whether Ainsley's execution of the maneuver was negligent in that he should have utilized the tug to help turn the ship at the point he ordered her to back or even earlier. Captain Kadoya appears to have been of the opinion that the ship's proximity to the buoys prevented her from turning earlier as it should have done. *See* Kadoya Dep. at 56–57. This issue was not adequately addressed at trial, and any such negligence is of no importance to the court as it is covered by the pilot ticket's exculpatory clause.

Second, the plaintiff's contention that Ainsley would have started backing the ship much earlier had he known the line was not fast is not an accurate recounting of the testimony. The court has reviewed the transcript of Ainsley's testimony and cannot agree with the plaintiff's conclusion. Unfortunately, this portion of the testimony is confusing and contradictory in a number of material aspects. The plaintiff did, in fact, ask Ainsley what he would have done had he known the line was not made fast. Ainsley's answer does not prove to be as helpful as the plaintiff would hope. Ainsley's response was: "What I would have done is nothing. I would have backed the ship up, which I did ...." Trial Tr. at 72. Ainsley was referring to the order of half astern at 11:28 which he insists he gave instead of a slow ahead order that the engine bell logger indicates was actually executed.

The first sentence in Ainsley's answer is of no use to the plaintiff and runs directly contrary to its claim. Ainsley quite clearly states he would have done nothing differently. Nor does the second sentence aid the plaintiff because it is not a statement as to what he *would* have done, but merely a statement as to what Ainsley did, or claims he did, which was to issue a half astern order at 11:28. Ainsley's statement was made on the basis of an important assumption—that there was a miscommunication in the engine orders—that runs contrary to the plaintiff's claims. The plaintiff cannot rely on Ainsley's statement without accepting that there was a problem with the engine orders. If the court were to find that Ainsley gave the half astern order at 11:28, then it would also conclude that the accident was a result of this miscommunication; therefore, the

plaintiff would still lose but on a different set of facts.

Additionally, the plaintiff's questioning of Ainsley in regard to this particular moment focused on stopping the ship rather than turning the ship, and the tug's indispensability in slowing or stopping the ship at this moment is not readily apparent. Ainsley's testimony indicates that he was not terribly concerned with the tug's failure to have a line up. When asked if it was important to know whether the line was up when he ordered the tug to back, Captain Ainsley stated that it was not a matter of life or death. Trial Tr. at 71. He added that he "could have used" the tug, but that its ability to assist in slowing or stopping the ship was not great and his main concern was slowing the ship's headway, not turning the ship, "which was not important at the time." Trial Tr. at 74. There was significant additional testimony at trial from both Ainsley and the defendants' expert, Captain Reinbold, that the tug was incapable of stopping a ship of this size. In fact, Reinbold noted that he had never seen a tug put on a ship's quarter to stop the ship; instead, tugs put up lines to provide lateral thrust. *See* Reinbold Test.

The court also notes that had Ainsley been relying on the tug to help stop the ship's forward motion, and had this been indispensable assistance, the court is certain that Ainsley's next orders would have been crash astern and drop anchor, orders not initiated until the very end of the operation. In other words, if Ainsley needed the tug to stop the ship and found that the tug was not available to do so, his next orders would have been far more drastic. Yet his orders over the next minute were half astern, then full astern, then crash astern. The circumstances leading up to the allision provide the court with the clear impression that an allision was not perceived to be imminent until the very end. At the time the tug was ordered to back, circumstances were not thought to be dire and the three most important figures, Phillips, Ainsley, and Kadoya, believed the ship would accomplish the maneuver successfully at this time. *See* Phillips Dep. at 25; Ex. 39; Kadoya Dep. at 47; Ex. 23 at 3. Therefore, even if the line should have been secure, or the tugboat captain should have alerted Ainsley that it was not secure, the court does not find that such conditions would have materially altered the outcome of the maneuver.

Finally, the court notes that the captain of the CAPE HENRY may have notified Ainsley that the tug was having problems getting its line up to the ship, thereby fulfilling whatever duty the tug may have had. At trial, the tug's captain, Bill Lucas, testified that he communicated to Ainsley that there was a problem with getting a line up and that a messenger line would be needed. Ainsley, while ultimately concluding at trial that he was not told that the tug was having this problem, was far less certain in his recollection as to what transpired with regard to the tug and this particular issue. Although this alleged communication occurred a couple minutes before Ainsley ordered the tug to back on its line,[12] it would have served the purpose of putting Ainsley on notice that there was a potential problem.

Even though Ainsley was unsure as to whether he was told of a problem with the line, his testimony clearly indicates that at a certain point leading up to the order to back, he was aware that the line was not fast. For the last portion of the maneuver as the ship was in the entrance channel,

---

12. The court is unable to determine exactly at what point this communication may have oc- curred.

Ainsley was on the starboard wing in order to observe the ship's position to the buoys. At times, he was aware of the location and actions of both the DRUM POINT and the CAPE HENRY. In fact, his testimony was that one minute prior to the order to back, he was aware that the line was not yet fast. *See* Trial Tr. at 67–68. It would seem that under such conditions, there would have been no duty to repeatedly inform Ainsley that the line was not yet fast, particularly considering the line's purpose was to assist the ship's lateral movement and that role was not yet needed.

## CONCLUSION

The court concludes that even if there was a duty to apprise Ainsley that the tug's line was not fast, this alleged breach of duty was not causally related to the allision. A number of negligent acts occurred in the docking maneuver that may have resulted in the allision, none of which can be attributed to Moran. The court is primarily concerned with the ship's closeness to the buoys and the effect this had on its positioning, as well as its speed as it cleared the buoys and prepared to turn starboard into its berth. The evidence and testimony gives the distinct impression that the ship was too close to the buoys and that at times during the operation the ship's speed was too fast.

The court notes, however, that though the ship may have been going faster than normal at various points in the operation according to a number of witnesses, it was not proceeding at a clearly unreasonable speed. Had it been doing so, pilot Phillips and Captain Kadoya had the experience and authority to warn Ainsley or even assume command of the vessel, which neither did. Additionally, Ainsley and Moran have offered a reasonable hypothesis as to the cause of the allision: The possibility that excessive speed at the end of the maneuver prevented the ship from stopping in time, and that this resulted from the crew's erroneous execution of Ainsley's orders. The court declines to speculate any further, noting that it need not determine the exact manner in which the accident occurred in order to conclude that Moran and Ainsley are not liable for the allision.

For the reasons set forth above, the plaintiff cannot recover under a negligence theory against either Captain Ronald Ainsley or Moran Towing.

The Clerk is DIRECTED to enter final judgment in favor of the defendants pursuant to Federal Rules of Civil Procedure Rule 58, and to send a copy of these findings of fact and conclusions of law to counsel.

It is so ORDERED.

## JUDGMENT IN A CIVIL CASE

[X] **Decision by the Court.** This action came for decision before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that plaintiff take nothing, that the action be dismissed on the merits, and that defendants recover of plaintiff their costs of action.